Thank you Judge White and the Northern District of California for joining us here this morning by designation of the Chief Justice. Welcome Judge White and I hope you'll enjoy your stay with us. Certainly. The first case this morning will be 06-1057. Please be seated. 06-1057 Nibco v. Tyco International. Mr. Underwood. Good morning Your Honor. Have you reserved for four minutes for rebuttal? Okay. May it please the Court. This case comes down to whether Tyco's use of two rods to align the bushes instead of one rod matters. There's no dispute in this case that Tyco has an outstanding body that uses oversized mouthstand openings. There's no dispute that it positions bushings within these oversized mouthstand openings and holds them in place during the molding process so that those bushings are aligned relative to each other. There's no dispute that only the alignment rods that are used to mold the apparatus of Tyco hold the bushings in such a position. The question then must be asked, why was Tyco using oversized mouthstand openings? And the reason that Tyco was using oversized mouthstand openings is quite simple. It's because they are employing and using the invention of the 3-4-7 method. But let me ask you. I thought you started off by saying the difference is one stem versus two stems. Yes. I thought the district court conceded that two stems could do it. I mean, that didn't seem to me, and again, I missed something, that that was the issue before the district court. I mean, he gave that one to you, did he not? With regard to the ballots coming up, yes. But the district court went further and found that there had erroneously argued that there was a disclaimer of that apparatus. The district court looked at one of the references cited by Tyco, the Edwards reference, and they cited to a statement made in the file record by the examiner indicating that Edwards taught a process of molding bushings and ballots. And when NIFCO, during the prosecution of the patent, advised the examiner, no, no, no, Edwards has nothing to do with ballots, has nothing to do with bushings, but rather molds only a insertable ballot seal into the ballot, or a later insertion of the ballot, the examiner withdrew that rejection based upon Edwards. Now, that is what the district court belonged down to or attached its importance to. That's what Tyco still maintains, even in its brief to this court. It's relevant for this court's consideration as to the difference between two-stem and one-stem ballots coming up. And this is the difference, I mean, the debate in the briefs and in the record seems to be this is the difference between absolute alignment and religious alignment. Well, there's been a misunderstanding, shall I say, at the district court level as to what absolute alignment is. Absolute alignment is the prior, the admitted prior art disclosed in discussing column one of the 347 pattern. That admitted prior art is where you have a ballot body where a ballot stamp opening is a machine all the way through and across the ballot body. Now, that requires precise machining, precise alignment, and is very difficult, tedious, and time-consuming to do. That's the admitted prior art. That's absolute alignment. The relative alignment is what we see both in the 347 pattern, bushings positioned on basically movable, precisely positioned rods within oversized ballot stamp openings. And again, I come back to why does Tyco use oversized ballot stamp openings. It's because they align the bushings relative one to another on the alignment rods, that it calls alignment rods in this case. Why does Tyco use two rods rather than one? Why do they use two rods rather than one? I think the reason is because they just decided for whatever engineering purpose they wanted to have the ability to come in from either side. But while the mold is closed, while the replicas are in position, there is no structural difference. Tyco spends six pages of his brief, Your Honor, talking about the careful machining that it has with the platen, that these stop blocks are then attached to the platen. That there's careful machining of the acting threads where the alignment rods go in. And that these alignment rods go in very precisely fitted in position openings in the lower mold core. These structures are all made out of steel, and when they're assembled, they don't move at all. They're as if they were one rod once they are finally assembled. Didn't the district court define or construe on the exact language that the aligning function is going through one rod, or one more rod is going through all the bushings? With regard to Claim 70, that's right. Claim 70, we believe the district court did so erroneously. Claim 70 calls for inserting a rod through, inserting a close fitting rod through the bushings to align the bushings. And we believe there's no basis for limiting that particular plane element to a single rod. As this court is aware, all three of the claims, Claims 6, 7, and 10, are presented with including, included, or comprising. All of those claims are open-ended terms. And under some circumstances, this court has held that when we receive the indefinite Article A, we're entitled to read that as one or more. And we believe that it would be an appropriate interpretation of that claim language to say a rod having a close fit through the bushings, or a pair of rods having a close fit through the bushings, each being sent through one of the bushings. There's no bias to that language at all. Claim 6 is inserting a valve stem rod through both bushings. Yes, it does. And we believe that a two-alignment rod coming from different directions, being held in very precise alignment, one with another by the lower bolt core, by typism of admission, is essentially the valve stem rod. We believe the valve stem rod is that structure which holds the bushings in perfect alignment with an oversized valve stem rod case. The 347 patent teaches that it's a single rod put through the valve disk replica. And in the typing process, they used two rods that go into the valve disk replica. But the structure, once the bolt is closed, is precisely the same. Here's my problem with the case. And I read through the transcript, is that I imagine the district court was trying really hard to understand. And on the question of whether or not you've got at least enough of a question to go forward to the jury on the equivalent question, it seems to me, and maybe to point you out, you have an expert report which you rely on in your briefs. And the expert report at least seems to make an effort to deal with the question relative to the absolute and the DOE questions. Well, can you point to me, in your argument with the district court, it didn't seem to me you were referencing the transcript, the expert report. Maybe I'm missing something. But reading through the transcript of your argument with the court, it seems like your comments were prospective to DOE. You're really quite conclusory. Am I wrong about that, or is there something I'm missing? We attached those materials to the motion of summary judgment. And to some extent, we lied about it for our appeal to the jury. But they were presented to the court in the context of the motion of summary judgment. But did you ever integrate what the expert was saying in his expert report into your argument before the court? I mean, whether or not you attached the documents to the- Your Honor, the argument that I just presented to you with one is absolute alignment. Absolute alignment is drilling a hole through the bushing, through the valve body, so that they're absolutely aligned in the machining process. That's absolute alignment. And that's what our expert opined on. And we presented that to the district court. We presented, obviously, our materials to this court here today. We disagree with the proposition of what type of drilling is absolute alignment. It is not precisely drilling a bearing surface in the body of the valve. Nor is it drilling a valve opening or a stem opening that will tightly receive a bearing. No, it relies on oversized valve stem openings. That's the genius of the 347 Act. What it did is that it transferred precise machining of the valve body components. Instead of a valve-to-valve-to-valve procedure, it precisely machined the molding components. And by having molding components that are not precisely machined, within the sloppy tolerances that we see in the Tyco process, we see that Tyco is enjoying all the benefits of the invention. It's instructive to note, Your Honor, that the tolerances that we see in the interface between the Tyco's alignment rods and the valve bushings is a very, very, very close tolerance. We see a very close tolerance as the alignment rods enter into the openings and the valve is running over the lower mold as well. But we see very sloppy tolerances. There's an angular gap between the outer end of the bushing and the inner end of the valve stem opening. And that is to allow the valve to cant within the valve stem openings. We have a valve here that Tyco produced to us that demonstrates that exact canting that's provided for by the teachings and inventions of the 347 and actually employed by Tyco. There's an issue before the court, I understand, by virtue of the objection of Tyco to that being here today. But if the court is interested to see- Are they still objecting? Are you still objecting? Yes, we are, Your Honor. Basically, it wasn't presented. It wasn't before the court. It's being presented as evidence, not as demonstration. It is not presented to the district court. We disagree, Your Honor. It was presented to the district court below. We have a transcript of the hearing that we cited in our submission where I walked up to the bailiff and handed it to him. He, in turn, handed it to the judge. The judge has seen this very, very badly. Well, I think we can do without it. We have your submission. We have your submissions. Very well, Your Honor. At least you thought of them. I would suggest, however, that Tyco's desire of wanting me not to see their own valve suggests that they do, in fact. Let me ask a quick question about the blind socket for a short time. The court, with respect to the blind socket, said that its client construction made clear that the socket had to be blinded. At the time, it was called a blind socket. And in this case, that means it has to be blinded when the bushing or valve center is placed in the socket. Except that, did you make a showing that the accused product came from that? No. We believe that blind socket is not a structural limitation of the claim. First of all, blind socket only appears in Claim 6. It does not appear in Claim 7 or 8. So if we accept the district court's client construction, that question is decided? I don't agree, Your Honor. I'm looking at the LaPaul case where even though it's described in the preamble of the claim, it provides no substantive substance at all to the body of the claim. It is merely locational. It tells you where the bearing goes into the position, where the bushing is in the position relative to the neck of the valve. And it really doesn't add anything to the claim body itself at all. So while we recognize the district court did make that ruling, we also recognize that this court is required to show no deference to that ruling as well. And I see I only have a few moments remaining now. People are saying it. All right. Problem or issue? It's Kreitler, Your Honor. Thank you. I have no way of knowing, looking at the spelling. May it please the court. My name is Eric Kreitler. I represent the Appellee Tyco Valves and Controls and its related companies. There are a number of Appellee companies. The district court in this case correctly granted summary judgment of non-enfranchisement as to Claims 6, 7, and 10. There was no misunderstanding as to the distinction between relative alignment and absolute alignment. This patent concerns a method. It doesn't concern a product. It doesn't concern oversized stem bores. The method involves very specific structures and very specific actions. The specific structures include replicas, a valve stem replica and a valve disc replica, and also a blind socket, all of which are required in Claim 6, and also specific actions, and the specific action that is common to all of the claims is inserting a stem replica or a rod through the valve disc replica and through both bushings to align the bushings. The 347 patent covers a method for relatively aligning a valve stem, a valve disc, and bushings. And here's, if I could interrupt just a minute. Yes, Your Honor. Here's the concern, the problem I have. If you accept claim construction or left to a DOE and a factual question, you've got summary judgment. And it seems to me on the question of absolute versus relative alignment, even just that question, let alone the factual and result issues that are raised, they put in an expert report, which is quite detailed, that reaches a number of conclusions. Why wasn't that enough, or why isn't that enough, to at least raise a question of that that should have gone to a jury? Your Honor, as to doctrine of equivalence, the court found that the plaintiff was precluded from alleging that methods of absolute alignment came within the scope of the patent. And then he went on to conclude that Typo's product consisted of absolute alignment. Correct. And my question is, why did the expert report, which is very detailed here, and the other arguments on the record, wasn't there at least enough of a fact question to put that before the jury? Because the prosecution history is contrary to the expert report. Your Honor, the whole notion of absolute alignment versus relative alignment arose in the context of two office actions and two responses, both involving the Edwards patent as the reference. The Edwards patent involved the molding of a valve seat insert. There was a reinforcing ring, a metallic reinforcing ring, that was inside of the elastomer that was part of the valve seat. During molding, that reinforcing ring was held in place by two removable cores. It was exactly what Typo does. Essentially, two alignment rods holding the component into place, the alignment rods connected to the mold, just as the Typo method uses. NIPCO used the concept of absolute versus relative alignment to distinguish prior arc valve manufacturing methods and to distinguish Edwards specifically. NIPCO said that in the alleged invention, the bushings were free-floating and that the invention taught relative alignment. They said that in the prior manufacturing methods, there was absolute alignment with respect to a fixed location in the valve body. As to Edwards, they said Edwards involved precisely fixing the reinforcement ring, that it was not free-floating during the manufacturing process, and that it did not simultaneously fix the position of relatively movable parts. NIPCO, in its response to the second office action, said that Edwards taught against free-floating, taught against relative alignment, because the positioning cores, again, in very analogous to Typo's alignment rods, were fixed with respect to the mold, and also said that it didn't teach the use of replicas. So, the absolute versus relative alignment distinction was set in a discussion of Edwards. What NIPCO said essentially is that their method involved an assembly of components that was free-floating during the manufacturing process. The components would move relative to one another. If you moved the valve stem replica, that would move the valve disc replica, and it would move the bushings. The bushings, by definition, would always be in perfect alignment, because they were in that assembly that was free-floating during the manufacturing process. Typo uses absolute alignment. And the reason that we spelled out the various components that are involved in our manufacturing process is because there are multiple components that are used in order to hold two separate alignment rods in position, so that two bushings can be separately positioned and aligned independent of one another during the manufacturing process. So that difference between absolute alignment and relative alignment, between components whose position is dependent upon one another, and components that are aligned independent of one another, is what the prosecution history demonstrated in this case. And that's what the trial judge, the district court judge, relied upon in determining that the typo method was distinctly different than the method that was claimed in the patent. Your method, though, does involve some, it doesn't matter, some tolerances? I mean, it's not an absolute fit, is it? Well, Your Honor, the bushings are not pressed fit into the stem opening. There is space between the bushing and the stem opening. But that has nothing to do with the alignment process. Tyco does not align its bushings based on the stem opening surface. It aligns its bushings based on a number of external structures, an alignment rod, a guide block, a guide sleeve. In the guide sleeve there are screw threads to hold the alignment rod tight. Those components all have very tight tolerances, so that in the process of aligning the bushing relative to the mold, outside of the valve body, that bushing is held in position to a very tight tolerance. It's true that there's space between the bushing and the valve stem opening, but that has nothing to do with our alignment process. Again, NIPCO has suggested several times that the mere fact that Tyco has oversized valve stem openings is dispositive here, and it isn't. Stem openings that are larger than the bushings is recited in different fashion in some of the claims, but it's one structural element that's recited in those claims. What's the reason for the oversized valves? There was evidence before as to how that developed historically. Initially, in Tyco's manufacturing method, there were going to be no bearings at all. Then Tyco pressed the bearings, and then the engineers discovered that there was a problem with the flash. When they molded, there was excess rubber, and it had to be cleaned every time they molded a valve seat. The stem bore was oversized so that the elastomer would have some place to flow, so that that cleaning wouldn't have to occur every time. That was the record below. What's important here, though, is it doesn't relate to our alignment method in any way. That, I think, can be seen by all of the evidence that is before this court and was before the district court in connection with the summary judgment motion. Mr. Underwood, in his argument, addressed one of the other elements of Claim 6, which is the blind socket. He said that the blind socket is simply a reference point. It isn't a claim limitation, or it's not a structural limitation of the claim. And he relied upon Vaubel. But the Vaubel decision, particularly as it was in light of the discussion in the Eaton case, is very, very different. In Vaubel, there was a structural element that was not described in the specification. It was a breast beam or a breast plate. It was described with two different terms. It was not described in the specification. It was not illustrated in any of the drawings. It was not manipulated in any way in any of the method claims. That's very, very different than the blind socket in our case. In our case, the blind socket is shown in the drawings. It's referenced at least four times in the specification. And it, in fact, is manipulated in the claim because the stem replica is inserted into the blind socket. Clearly, blind socket was not needed as a reference point because Claims 7 and 10 both talk about inserting a rod or the equivalent of a stem replica into simply a stem opening. But Claim 6 talks about inserting the stem replica into a neck opening and a blind socket opening. Those terms were not needed as reference points. Stem opening was a perfectly adequate reference point. The only reason for the greater specificity in Claim 6 must have been to require a more specific structure in the method. And therefore, blind socket is a limitation very, very different than in the Vaubel case. I don't think that's just setting up the environment for the invention. No, Your Honor, because if that were the case, then, again, the term stem opening, which is used in the other two claims, would be perfectly sufficient. The greater specificity in Claim 6 must have been for a reason, and it could only be to set up a structural limitation. Again, it's shown in the drawings and it's referenced multiple times in the specification as well. Well, in the Eaton case, this court commented upon or explained the decision in Vaubel, and that's exactly what the court appointed to. The court said that the term breastbeam and breastplate in Vaubel, that those were not structural limitations. They were only in place to describe the direction in which woven material moved out of a loom. And the court pointed to the fact that, in fact, these structures were not described in the specification, not shown in the illustrations, in the drawings, and were not manipulated in any of the method claims. Now, there are some. We've now addressed a number of elements of Claim 6. As to Claim 10, Claim 10 is a means plus function claim in which, to a great extent, the allegations from the acquisitions of the parties were the same in the court below, which was that it was a means plus function claim, that the function of the structure was, in fact, described in the claim language, and that the corresponding structure was a Vaub stem replica, although the parties disagreed as to the meaning of Vaub stem replica. They agreed that that was the structure disclosed in the specification. The Vaub stem replica construction by the district court really didn't help very much there. No, but the... Well, it does help, but no, it doesn't resolve the... It doesn't mean the parties had complete agreement on Claim 10. And it left open an issue which was decided in favor of Tyco in the court below. But NIPCO, on appeal now, for the first time, asserts that Claim 10 is a step plus function claim. And that is a change from their prior position. It is an argument that was never raised in the court below. It's an argument that's flawed in several respects. The Step 4 language is not used. There is an action that is recited in the claim. There is no reason to find this a step plus function claim. But in addition to that, this is an argument that was not made in the court below. And, in fact, NIPCO in the court below asserted that it was a means plus function claim. That position was accepted by the district court. And so we have argued here that NIPCO has both waived and has stopped from raising this new argument. Would I be correct in taking your argument to mean that aligning means, you have to look for the structure for the aligning means in the specification. And the structure is basically, could be one rod, but a rod that goes through both bushings. And, therefore, the structure is not the same in your product. And if you look at doctrinal equivalence, you'd have to go further and say that using two rods was the equivalent of using one rod. That's correct, Your Honor. Clearly, in our case, using two rods was not the equivalent of one rod. We have two equivalents. One would be equivalence for means plus function and another equivalence for the doctrinal equivalence. Correct, Your Honor. But in this case, in the specification, what's shown is a rod that goes through both bushings and all the way through the valve disc replica and holds all of these components in place as an assembly, which, again, is free to float during the manufacturing process and brings about relative alignment in the bushings in the valve. Thank you. Thank you, Your Honor. Mr. Ramillo. Thank you. In response, I'd like to make one point very, very abundantly clear. There is no prosecution history to stop it in this case. The comments that were referred to in the two responses made by NIFA during prosecution all dealt with the issue of relative alignment of the bushings, one to the other. None of them ever disclaimed or argued that two pieces of valve stem replica would not suffice to form the valve stem replica as claimed. And the alignment means as claimed. The Edwards reference, that discloses, you're right, a seal that is inserted into a valve. But it in no way discloses a valve. It doesn't have a valve having oversized valve stem openings. It in no way discloses bushings. It doesn't even mention bushings at all in it. So how can it be any teaching or disclaimer by NIFA that it disclaimed valve stem replica having two pieces versus one piece when Edwards showed none of the relevant salient features that go into a definition or proper definition of valve stem replica? If the rod or rods have to go through all the bushings, in other words, each rod has to go through all the bushings, aren't you limited to a doctrine of equivalence argument? If that interpretation holds today, we would agree, Your Honor. But the district court below precluded us as a matter of law from advancing a doctrine of equivalence argument because of misapprehension as to what happened below during prosecution. The district court found that there was a prosecution of valve replica estoppel that precluded us from advancing the exact theory that they wanted. We believe that was the case. And on Claim 10, you'd have to have two equivalents. First, you'd have to have an equivalence of structure to the means, assuming it's a means-plus function, not a step-plus function provision. You'd have to have equivalence of the structures, and then you would have to say the structure is the equivalent. An equivalent structure is then equivalent to the doctrine of equivalence? Yes, there's a case on the point, and I believe it's Nystrom, that says in the footnote that it depends as to when the equivalent structure developed. If the equivalent structure developed before the eviction or after. If the equivalent structure existed before, then the one developed paragraph 6 analysis collapses into a standard document equivalent analysis. There's really no analytical difference between the two. So we're not suggesting. The suggestion that we have wholesale changed our position in this case is absolutely false. As a practical matter, every interpretation that has been submitted by NIFCO has the practical effect of being exactly the same. Bounce bin replica is a structure that holds, pushes within an oversized bounce bin while doing the molding process, relatively aligned with one another. A bounce disc replica is a structure that forms the mold portion to form the seat for the fluid passageway within which the bounce seat can seal the valve. All right, Senator Underwood. Thank you.